MARIA MASON, Adm'r of the Estate of Daniel T. Mason, Plaintiff-Appellant, *v.* MUNDELEIN LANES, INC., Defendant-Appellee.

Second District   No. 78-193

Opinion filed June 7, 1979.

Thomas A. Clancy, of John C. Mullen & Assoc., of Chicago, for appellant.

J. Patrick Craddock and Herbert F. Stride, both of Chicago, for appellee.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

The plaintiff appeals from a directed verdict for the defendant in a dramshop action (Ill. Rev. Stat. 1973, ch. 43, par. 135) wherein, as administrator of the estate of Daniel T. Mason, she sued Mundelein Lanes, Inc., for the death of her husband, Daniel T. Mason, who was killed by running into a light pole while driving on the highway. The amended complaint is in three counts, naming two other taverns as defendants. However, these defendants were dropped from the case, one on a motion to quash the summons and the other under summary judgment. The action thus continued only as to Mundelein Lanes, Inc. It is to be noted that the action is for loss of support and is, under dramshop law, an "in consequence action" with no third person's conduct being involved.

The defendant corporation admits the decedent was drinking in its establishment shortly before he was killed but contends there was no evidence he was intoxicated when he left the bowling alley or that a state of intoxication was the cause of his running off the road and striking the light pole.

The evidence adduced at trial indicated that Daniel T. Mason, the decedent, came to the bowling lanes at about 5 or 5:30 p.m. on October 22, 1974, had a beer or two and then left and went home. He returned to Mundelein Lanes about 7:30 p.m. and was in the bar section of the establishment for several hours on the night of his death. He was seen by some witnesses who testified he consumed several drinks while he was there. He left Mundelein Lanes sometime after 11:30 p.m. and had the fatal accident sometime after midnight on the west end of Lake-Cook Road in Lake County.

At the close of all the evidence, the trial court granted the defendant's motion for a directed verdict and the plaintiff appeals, contending that the trial court erred (1) in directing a verdict for the defendant on the

basis of the trial testimony and (2) in several of its evidentiary rulings, that is, (a) in excluding testimony as to blood tests made by the county coroner; (b) in excluding the testimony of the plaintiff's witness, Ali Villareal; (c) in precluding the reading of the defendant's answers to interrogatories as an admission against interest; (d) in excluding certain depositions and statements of the assistant manager of the defendant; (e) in not ordering the production of the statement of Edward Jurewic and in barring certain portions of his deposition, and (f) in not allowing the use of evidence depositions of persons not residents of Lake County and not present in the trial court (but who resided in Cook County).

At the trial the plaintiff attempted to introduce the results of blood tests made by the coroner to show the alcoholic content of the decedent's blood. The defendant objected citing section 10(e) of "An Act to revise the law in relation to coroners" (Ill. Rev. Stat. 1973, ch. 31, par. 10(e)), which reads in pertinent part as follows:

> "The coroner causing the blood and urine to be withdrawn shall be notified of the results of any analysis made by the Department of Public Health and the Department of Public Health shall keep a record of the results of all such examinations to be used for statistical purposes. The results of the statistical examinations referred to in this paragraph shall not be admissible in evidence in any action of any kind in any court or before any tribunal, board, agency or person, but shall be used only for statistical purposes."

The plaintiff argues that this statute "refers to statistical results complied and sent to State of Illinois offices, not the specific results of one investigation." The plaintiff thus would interpret the cited language to mean that the coroner "should not testify as to relationships between drinking and driving as reflected in these empirical statistics but should be allowed to testify as to individual results."

■■ We are unable to accept the plaintiff's interpretation of the statute. As did the court in *Swank v. Bertuca* (1976), 41 Ill. App. 3d 229, we construe the language cited above as indicating a legislative determination that the results of blood tests by the county coroner pursuant to the authority of section 10(e) of "An Act to revise the law in relation to coroners" may not be used for evidentiary purposes in a private lawsuit. The majority opinion in *Smock v. Highway Com.* (1978), 60 Ill. App. 3d 201, while dealing primarily with the implied consent provisions of The Illinois Vehicle Code (Ill. Rev. Stat. 1973, ch. 95½, par. 11—501) approved the reasoning in *Swank.* We are of the opinion that the trial court did not err in excluding the results of the coroner's blood tests.

Certain other evidentiary rulings of the trial court are objected to by the plaintiff. The plaintiff called Ali Villareal, a cousin of the plaintiff, who was alleged to have been the last person to sit and drink with the decedent

before he left Mundelein Lanes at about 11:30 p.m. The plaintiff made an offer of proof to show that Villareal would have testified that the decedent sat and drank vodka gimlets with him in the bowling alley after 10:30 p.m. on the night in question. The assistant manager of the bowling lanes had testified that the decedent, although not drunk when he last observed him, which was sometime before 10:30 p.m., was "well on his way" to being so. To the question, "When you saw Danny Mason wouldn't you characterize him as being well on his way?" the witness replied, "Yes, you could tell that he had been drinking you know there was nothing that really sticks out that tells you that he was drinking but just by the way he talked and that, you could tell that he had had a lot to drink and it wouldn't be long, if he kept drinking, it wouldn't be long before he was drunk." The purpose of Villareal's testimony would obviously have been to establish that the decedent had had alcoholic drinks *after* he was observed by Jurewic, the assistant manager of the bowling lanes, to be "well on his way," and to establish by inference that since the decedent had had further drinks after the time when Jurewic thought that if he kept on drinking "it wouldn't be long before he was drunk," that the decedent was, in fact, drunk when he left the bowling alley.

■■ Villareal's testimony, however, was excluded as a sanction against the plaintiff for failure to cooperate in discovery and furnish the address of Villareal to the defense prior to trial. As the testimony of Villareal, if allowed, may have been sufficient to raise an inference of intoxication and thus to pose a jury question, the sanction of exclusion was a harsh one indeed, since any significant evidence may have been sufficient to preclude a directed verdict. We, therefore, think it appropriate to review the background of the court's ruling excluding this testimony. It appears from the colloquy between court and counsel regarding the ruling that the name of Ali Villareal was first mentioned as a possible witness in an answer to an interrogatory served on another defendant in April of 1976. At a deposition taken in November 1977 in Florida, at which time counsel for defendant inquired as to Villareal's address, plaintiff's counsel responded that he did not have the address with him and might not have it at all; that Villareal had moved and that plaintiff's counsel would definitely be able to locate him when he needed to. Villareal was an acquaintance of Jurewic, the defendant's assistant manager, and a potential plaintiff's witness. In 1975 the defense had been alerted that Villareal was a potential witness in the case when, during the deposition of Maria Mason, Villareal's name came up as a person who had been drinking with the decedent that night. At that time, when she was asked about Villareal's address, she replied that she did not know the address but knew he lived in Half Day. Apparently no further efforts were made by the defense to ascertain his address or question him. After the

November 1977 deposition of Jurewic in Florida, at which time defense counsel inquired as to Villareal's address and was told by plaintiff's counsel that he did not have it available, there was no evidence that defense counsel ever followed his inquiry up with plaintiff's counsel or anyone else to ascertain the address of Villareal or to learn what his testimony might be, if he was called by the plaintiff. As Villareal was living nearby and was in touch with the plaintiff (who was his cousin) there is no doubt his whereabouts could easily have been ascertained by defense counsel if defense counsel had reminded plaintiff's counsel he had neglected to supply this information. Since the address of Villareal, an Illinois resident, was requested by defense counsel at a deposition in Florida under the pressure of time requirements of such occasions (as is evidenced by defense counsel's acknowledgment that the reporter handed the typed deposition to him and plaintiff's counsel at the airport), we think there was no evidence that the failure to give defense counsel this information was willful on plaintiff's counsel's part. While it was a dereliction on plaintiff's counsel's part not to have followed up after defense counsel's request for the information, the course of dealing here does not suggest that kind of obstruction which merits a severe sanction, nor does it indicate any grave concern for the information in question on the part of the defense. Villareal had no telephone and he had moved several times so that he was not an easy person to contact directly. Plaintiff's counsel relied on the plaintiff, who was Villareal's cousin, to get in touch with him by calling personally at his home and plaintiff's counsel had particular reason to be concerned about Villareal's current address. Therefore, there is no indication that counsel's ignorance of his current address was a subterfuge. We think, therefore, that the sanction excluding Villareal's testimony was, under the circumstances, too severe. Bearing in mind that a motion for a directed verdict was granted in this case, and bearing in mind further that any credible evidence of intoxication of the decedent may have precluded the granting of such a motion, using the *Pedrick* standard (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494), it is apparent that the exclusion of the testimony tending to show that the decedent may have had additional drinks subsequent to the time he was observed by Jurewic to be "well on his way," was severely damaging to the plaintiff's case. The testimony of other available witnesses as to decedent's condition when he left the bowling lanes was all given by defendant's employees and natural was noncommital. Under these circumstances, Villareal's testimony may have been crucial and should have been heard.

We turn now to what we consider to be the fundamental question in this case—whether the trial court was correct in directing a verdict for the defendant at the close of all the evidence. Measured by the familiar stands

of *Pedrick* (37 Ill. 2d 494) that would require that the evidence so overwhelmingly favor the movant that no contrary verdict based on that evidence could ever stand. Considering Villareal's testimony, as we are inclined to think the jury should have been allowed to do, we have the following facts established by the evidence: (1) that the decedent spent five or six hours in the bowling lanes on the evening in question and no one testified he was seen bowling, although several persons saw him either drinking or with a glass in his hand during that time; (2) the assistant manager of the bowling lanes thought he was "well on his way" to being drunk, when he saw him last (which was between 9:30 and 10:30 p.m.); (3) Villareal, whose testimony, we think, should have been heard, would have testified that the decedent had at least two vodka gimlets after that, just before leaving the tavern; (4) the decedent followed a strange woman home in his car and then, being pursued by her irate husband and his friend, drove his car at about 100 miles per hour down the highway so recklessly that he ran off the road into a light pole and was killed. While positive evidence is lacking, these circumstances establish at least an inference of intoxication at the time of the decedent's death.

■■ There is, however, another hurdle the plaintiff must clear in order to preclude a directed verdict. This, as we have noted above, is an "in consequence" case under the Dramshop Act. The decedent died as the result of his own conduct; no other person's act causing or contributing to the death through which the plaintiff's support was lost. It is established law in Illinois that in actions under the Dramshop Act, the plaintiff must prove that the decedent's intoxication was the proximate cause of his death, not merely a factor contributing to it, where the decedent's own conduct is the cause of the death. This apparently has been the law as to an "in consequence" type of action since the decision in *Shugart v. Egan* (1876), 83 Ill. 56, cited in the leading case of *Danhof v. Osborne* (1957), 11 Ill. 2d 77, where the court found that the plaintiff-wife was not entitled to recover for injuries to her husband, causing loss of support, where he was beaten by a jealous husband while he (plaintiff's husband) was intoxicated in a tavern with the aggressor's wife, since the victim's intoxication was not the proximate cause of the beating. This distinction was noted in *Hernandez v. Diaz* (1964), 31 Ill. 2d 393, and in many subsequent appellate court cases and recently again in *Nelson v. Araiza* (1978), 69 Ill. 2d 534.

The significance of this distinction arises out of the testimony of the defense witness, Jean McLean. She testified that on the evening of the decedent's death she had been visiting a woman friend who was ill and depressed and had stayed with her until about midnight. She then left her friend's house and began driving home. She was traveling approximately 35 miles per hour and she noticed that a "dark" car was trailing her car

very closely. This car did not pass her and did not either increase or decrease the distance from her but kept very close behind her car as she drove down the highway to her home. The car, in fact, was following hers so closely that she could not even see its headlights. Being frightened by a car following so closely for several miles, she drove into a gas station and asked the attendant where there was a phone so she could call the police. The attendant, after learning what the trouble was, said that he was about ready to close up anyway and would drive his own car along side of hers on the way home. He did so for as far as he was going but when she had to turn off in another direction, she immediately noticed the same car behind her again. At this time she speeded up and reached her own residential street where she began honking the horn continuously as she approached her house. Her husband and another man, who was visiting him, ran out, and after she told them a man was following her, they blocked the street. The decedent had gone by her house and when he discovered he was on a dead end street, he turned around and came back. Noticing the street was blocked, he accelerated, went across the McLeans' lawn and swung back onto the street. McLean and his friend pursued him in their car. Fleeing down the highway at a high speed—possibly 100 miles per hour, according to the testimony of one witness—the decedent failed to make a turn on the Lake-Cook Road, collided with a light pole and was killed.

Under this state of facts, the defense contends that the proximate cause of decedent's death was his attempt to elude the pursuing husband. It was his desire to escape from a situation which was, at the least, embarrassing and might have been grounds for charges against him, which caused him to drive at such reckless speed, rather than his intoxication. The defense thus asserts a separate and intervening cause for the decedent's recklessness apart from his intoxication and attempts to remove intoxication as the proximate cause of the decedent's death. The defense, in support of this argument, points out that even if the decedent was slightly intoxicated when he left the tavern it obviously did not affect his driving, since he kept his car tightly under control for several miles while he was following Mrs. McLean and was driving well enough to elude the roadblock which McLean and his friend set up for him on the dead end street. Thus, they say, his recklessness did not indicate intoxication so much as an overriding desire to escape his pursuers.

■ The defendant, therefore, while contending there was not sufficient evidence of intoxication to present a jury question, also argues that in any event the plaintiff cannot recover in this "in consequence" action because the circumstances indicate that fear of pursuit was the cause of the decedent's reckless driving—that he drove carefully while he was the pursuer and only drove without regard to his own safety when he was

being pursued—that his alleged state of intoxication was not the cause of the fatal accident.

This is a logical argument but it is not an established fact. It may raise an inference rebutting the inference that the decedent lost control of his car because he was intoxicated, but both possibilities are entitled to be considered by the jury. There is clearly *some* evidence linking the decedent's death with his having had a number of drinks and it is by no means clear that his unusual behavior in following Mrs. McLean closely for several miles at midnight did not reflect the discarding of a normal standard of behavior resulting from intoxication. Moreover, even if the decedent fled McLean in fear there is a logical inference that his failure to negotiate a turn may have been due to the impairment of his driving skill caused by his intoxication. It is not, in our opinion, such a clear case that it should be kept from the jury merely as the result of a conclusion drawn by the trial court that the influence of fear or embarrassment had superceded the previous influence of drink, making his intoxication at the time of leaving the bowling lanes irrelevant.

We are of the opinion, therefore, that the question whether the decedent was intoxicated when he left Mundelein Lanes was, under all the facts, one for the jury but, of course, under proper instructions defining proximate cause so that the jury knows that the plaintiff must establish the fact of intoxication and also must establish that the decedent's death was proximately caused by his being intoxicated, not from some other intervening cause.

There were several other evidentiary rulings challenged by the plaintiff. Since these situations will probably not recur on the trial of the case we will refrain from ruling on them as they appear in the present context.

The judgment of the circuit court of Lake County is reversed and the cause is remanded for a new trial not inconsistent with this opinion.

Reversed and remanded.

NASH and LINDBERG, JJ., concur.